## UNITED STATES v. MOONEY, Mercantile Appraiser, et al.

(District Court, E. D. Pennsylvania.    December 7, 1920.)

### No. 2049.

Courts ⊙═262 (4)—Federal court will not enjoin imposition of license tax on federal corporation incorporated in state.

Where a corporation organized by the United States for war purposes, but incorporated under the laws of a state to give it legal standing to sue and be sued, as incidental to its government activities established a restaurant open to the public, a federal court will not entertain a suit to enjoin the authorities of the state from imposing a license tax on it as a restaurant keeper, when it has full opportunity under the state laws to contest its liability in the state courts.

In Equity.    Suit by the United States against James E. Mooney, Mercantile Appraiser, and others.    Decree for defendants.

Charles D. McAvoy, U. S. Atty., and Wm. Y. C. Anderson, both of Philadelphia, Pa., for U. S. Shipping Board.

Wm. I. Schaffer, Atty. Gen., and A. L. Shay, Deputy Atty. Gen., of Pennsylvania, for defendants.

DICKINSON, District Judge.    This cause, in respect to the sum involved, is of no importance to either of the parties.    There is, however, thought to be a principle of law involved of sufficient importance to justify the trial of the cause and to have it determined by the court.

There are two questions first arising out of what led up to this proceeding, which are best disposed of by a short outline statement of the facts.    Without attempting an accurate statement of the relations between the United States and the corporations and persons who are in this controversy with the defendants, it will suffice to make the general statement that the United States, as part of its war activities, created certain boards, and called to its assistance certain corporations charged with the construction of ships and otherwise building up and supporting a merchant marine.

The general plan of the scheme adopted was the organization of what is commonly known as the Shipping Board, the Emergency Fleet Corporation, and corporations which had directly in charge the construction of vessels.    One of the latter was the Merchant Ship Building Company.    This last-named corporation secured a location and built a ship-building plant in the outskirts of Bristol, Pa.    The scheme embraced these private organizations as having nominally an independent existence, with the right to issue stock, as corporations ordinarily possess the right to do.    In reality, however, they were in

practical effect nothing more than agencies of the United States, and the United States supplied all their capital, and was the owner of their entire issue of stock, except perhaps a few shares, which were held by individuals purely for organization purposes, or for the purpose of complying with the laws of the state of their formal incorporation.

The Merchant Ship Building Company is thus in form a corporation of the state of Delaware, having a charter issued by that state. It was found to be practically and absolutely necessary for the corporation, in addition to the ordinary work of building ships, to extend its activities in order to meet the problems of the housing and living needs of its employees. Out of this necessity grew the building of houses and the establishment of a restaurant. In order to maintain the morale of the working force, it was further found to be practically necessary to provide the men with means of entertainment when not actually employed at work.

A town grew up around the plant thus located, to which was given the name of Harriman. It is some little distance from Bristol. Visitors to the plant on business or otherwise could find no eating accommodations other than that maintained in connection with the shipbuilding works. Out of this situation there grew up the practice of giving dances and other functions, to which the general public were invited, and to open the restaurant to the general public, by offering its facilities to dinner parties and other functions. The Merchant Ship Building Company is the real plaintiff in the instant case, and is hereinafter called plaintiff.

The mercantile tax appraiser, acting under authority of the law of Pennsylvania, assessed the plaintiff as one engaged in the business of a restaurant keeper. The purpose of this was to lay the basis for the levy of a tax or the collection of a license fee. This is essentially an excise tax, which is levied against and paid by those engaged in a mercantile or commercial occupation or business.

The laws of Pennsylvania provide for a contest of the right of the state to thus tax a particular individual by the allowance to him of a series of appeals, first to the county treasurer, and from any adverse judgment rendered by him to the proper court of common pleas, and from any adverse judgment there to the Superior Court, and thence by allocatur to the Supreme Court of the state. Before the person attempted to be taxed becomes liable to the payment of the tax he thus receives the full benefit of due process proceedings. This plaintiff pursued the rights thus given it under the laws of Pennsylvania as far as a judgment rendered by the county treasurer, who adjudged it to be liable for the tax. No appeal was taken to any court of common pleas, but instead thereof the plaintiff had recourse to the proceedings now before us.

It has already been found by this court in other cases that the plaintiff corporation is not the United States, and, in consequence, may sue and be sued as a private corporation. It has also been held that, as all the stock of the corporation is owned by the United States, and all the moneys employed in the activities of the plaintiff are supplied by the United States, and all the moneys which flow to the plaintiff

are received by it as the moneys of the United States, so far as those activities concern the war purposes of the United States, in the furtherance of which the plaintiff is engaged as the agent of the United States, all such moneys and the property purchased therewith or produced for war purposes, is the property of the United States, and as such may be the subject of larceny.

A further consequence follows as hereinafter stated. The plaintiff itself has practically accepted and applied the principles of law involved by becoming incorporated in compliance and in conformity with laws of Delaware, so as to have existence as a legal person, and causing itself to be registered in compliance and in conformity with the laws of Pennsylvania, in order that it might lawfully engage in business to be transacted within the latter state. The plaintiff, in consequence, may be regarded as having something of a dual personality, in the respect that it may act individually as a person and for itself alone, or it may act as the agent of the United States, and wholly for the United States, having received authority to so act. It may also act during a given time alternately or substantially simultaneously, both for itself and for the United States as its agent.

There is not only nothing unusual in the supposititious situation thus presented, but it is the usual one, although not one necessarily present. A broker, attorney at law, artisan, or corporation may be brought into the war or other activities of the government to do for the government what they might have done for themselves. Assuming the laws of the state required of all persons engaged in the occupation or business suggested by these designations of the persons in government employ that they should be licensed and pay a license fee or excise tax, that the state sought to enforce these laws, and that the individuals concerned denied themselves to be subject to such laws, we have before us a situation which presents the questions involved in the instant proceeding.

What are the rights, as individuals, of the persons employed? In what way is the United States concerned, and, so far as it is concerned, how are the rights of the state and of the individuals affected thereby? The right of any one of these individuals would be to deny liability to the payment of the tax. If he wished to secure the right to follow the occupation or business in question outside of what he did for the United States, we assume his liability to the tax could not be successfully denied. If he wished to confine his activities to what he did for the United States, we will assume he need not be licensed, and hence would not be liable to the tax. In what different position is he, so far as affects his legal status, from one who is assessed as engaged in an occupation or business, who denies that he is so engaged? An answer to this question leads us to the second question propounded. How is the United States affected by or in any way concerned with the fact that he is taxed or not taxed?

The only answer which suggests itself is the answer made by plaintiff's counsel, which in effect is that the employee of the United States is thereby interfered with and hampered in what he does for the United States. In a far-fetched sense this is true; but it is more of the truth

of fiction than of the realities of life or of the present fact situation. The trolley company which exacts of an employee of the United States the payment of car fare, and refuses to take him to his place of employment unless the fare is paid, hampers and interferes with the operations of government to the same extent in theory, and if the employee does not happen to have his car fare with him interferes in a far more practical sense. It would never be contended, however, that the United States was concerned in any way in any litigation which may grow out of the relations between its employees and the trolley company.

The consequence of the United States pressing its undoubted right to intervene to the limit of what may affect it in the remote and indirect way indicated would be to raise situations with which it would be impracticable to deal, even if they did not become ludicrous. The United States might, of course, become directly involved, and this brings us to what was before referred to as a corollary to the propositions laid down in the cases already ruled. An illustration would be afforded by the situation presented, if the tax authorities sought to collect any judgment obtained against an employee by the issuance of an execution and levy thereunder upon property of the United States. Such an interference with the property of the United States would, of course, not be permitted. The levy even upon property of the taxpayer while in use in the service of the United States might also be forbidden. The question recurs, however: How is the United States affected by either the mere levy and assessment of the tax or the entry of a judgment for the tax? The, as it seems to us, obvious answer to this question brings us in turn to the final, and we think controlling, question in the instant cause, which is: Should this court entertain jurisdiction of it?

The question may be discussed under the head of the power of the court or that of the propriety of the exercise of the power. As a denial of propriety is just as decisive of the cause as a denial of power, there is no occasion to inquire whether or not we have the power. The question of propriety arises, because the interests of two governments are involved—that of the state directly and clearly, and that of the United States by assumption, if any question is properly before us. There are no rights of which governments are more jealous than those involved in the assertion of the power to tax. This is because the power is vital to their existence. In a system of government, such as ours, in which every citizen of the United States may be, and with few exceptions is, a citizen of some state, the avoidance, whenever possible, of all conflicts of jurisdiction, or even of occasion for conflict between the officials, including the courts of the United States and those of the several states, is not only desirable, but almost a necessity. When the right of any one is involved, and comes before either a court of the United States or of a state to be declared, it is the duty of the court to adjudge the right and exert all its powers to enforce it, no matter what the consequences may be, or even if there be a conflict, which every one would deplore. The hand of no chancellor, however, can be so far forced as to be the cause of a conflict which

both should and can be averted, and may be averted, without any denial of any right, legal or equitable, which the parties may have.

One of the powers of government, which is indeed a right which is possessed by each state, is the power to tax its citizens, lessened only by the part necessarily surrendered, the assertion of which would impinge upon the sovereign powers of the United States. We have more or less remote analogues in those laws of the several states by which they have consented to their citizens becoming members of organizations which possess within certain limitations the powers of government over their membership. When any question affecting the relations between such members and the governing organization in respect to the assertion of any of the powers of government arises, any complaining member is required to exhaust the remedy afforded by his right to appeal to the tribunals of his organization before a court sitting as a court of equity will afford him any relief. This plaintiff had, under the state law, not only the right to successive appeals, such as already pointed out, before any assessment could be made; but after the assessment is thus made and the tax levied, so far as its sum is fixed, no tax can be exacted unless an action for it is brought, which goes through all the forms and steps of a common-law action, including appellate process. Beside all this, if what is called a federal question arises, he has the choice of raising the question in the state court, and, if ruled adversely to him, to take his appeal from the judgment of the highest appellate state courts, or, if any ground for removal to the courts of the United States exists, to remove the cause as soon as brought.

The power we are asked to exercise is one directed against the very vitals of the sovereignty of the state, and one which almost certainly must lead, if established, to conflicts between the courts. Without intending any pun, why should such a conflict be courted? The policy of avoiding it, even if the power to provoke it exists, has frequently been recognized, and indeed has congressional recognition, in the acts of Congress conferring special powers upon the District Courts, when it is necessary to protect officials of the United States from interference when in the performance of their duties, and also in the other acts withholding from the court, when acting through a single judge, from the right of issuing mandatory orders in some instances.

As it thus clearly appears that there is no occasion for this court to interpose between the state taxing authorities and the Merchant Ship Building Company, the real plaintiff, we decline to interfere, and dismiss the bill for want of equity, with costs to defendants.